H & R Distributing Co., Inc. v. Commissioner.
H & R Distributing Co. v. Commissioner
Docket No. 4463-71.
United States Tax Court
T.C. Memo 1972-203; 1972 Tax Ct. Memo LEXIS 56; 31 T.C.M. (CCH) 1014; T.C.M. (RIA) 72203; September 19, 1972, Filed Tried in Frankfort, Kentucky. *56 Held: Petitoner acquired intangible assets worth $87,500 upon purchasing an ice cream business on July 1, 1967. Bobby H. Richardson, for the petitioner. IRWIN
Memorandum Findings of Fact and Opinion *
IRWIN, Judge: Respondent determined a deficiency of $8,802.50 in the corporate income tax of petitioner for the taxable year ended May 31, 1969. Petitioner conceded one issue raised in the notice of deficiency. The only issue for decision is whether part of the price that petitioner paid to acquire an ice cream distributorship is allocable to intangible assets. Findings of Fact Some of the facts have been stipulated and they are so found. Petitioner is H & R Distributing Co., Inc., a Kentucky corporation whose principal place of business at all relevant times was Hazard, Ky. OnJuly 1, 1967, petitioner, who has been in the ice cream distributorship business for 12 to 14 years, purchased an ice cream business from Chappell's Dairy, Inc. (Chappell's) for $175,000. The business that petitioner purchased was in the nature of a distributorship of bulk ice cream for *57 sale by the scoop or dish in independent retail establishments. After acquiring the distributorship from Chappell's, sales of bulk ice cream accounted for about five percent Christopher D. Rhodes, for the respondent. of petitioner's total sales. Petitioner and Chappell's did not enter into a written agreement to effect the sale of the business. Chappell's financed the entire purchase price, and as its only security retained a security interest in the tangible assets of the ice cream business. The security instrument was the only written instrument executed by the parties. Petitioner made no down payment to acquire the business but agreed to pay Chappell's $0.25 per gallon for each gallon of ice cream purchased until the $175,000 was paid. Petitioner did not purchase the Chappell's brand name or use this name after acquiring the business. As soon as advertising materials could be prepared, petitioner began using its own brand name. Although Chappell's had manufactured its own brand of ice cream and petitioner sold ice cream manufactured by the Beatrice Foods plant in Richmond, Ky., neither Chappell's nor petitioner's ice cream had unusual or distinguishable characteristics. Both *58 purchased bulk ice cream from the Beatrice Food Company plant in Richmond, Ky.
Among the tangible assets that petitioner purchased from Chappell's were 272 "dip coolers" and 42 cabinets. Dip coolers had 1015 from four to ten holes in which a five gallon container of ice cream could be placed and from which an attendant at a retail establishment could dish out individual servings of ice cream. All of the freezer cabinets had been installed by Chappell's in retail establishments, the number of which was about 300 at the time of the sale. As of the date that petitioner purchased the business these freezer cabinets were over 11 years old on the average. On its income tax returns for the years ended May 31, 1968, and May 31, 1969, petitioner claimed a depreciation basis for each of the dip coolers of either $337.72 or $422.14 depending on their size. Within a few months after purchasing Chappell's business petitioner bought some new dip coolers similar to those already in use. The following chart indicates the prices of various kinds of dip coolers when purchased by petitioner: Date
Price Paid For
Purchased
6-hole
8-hole
10-hole
9-30-67
$317.39
$351.28
$ 424.79
319.61
357.88
10-31-67
338.90
409.30
477.58
12-31-67
319.35
356.28
357.02
392.52
*59 Petitioner assigned a useful life of five years to the new cabinets for computing depreciation. The basis for depreciation that petitioner assigned to each of the used cabinets acquired from Chappell's was greater than the purchase price of a similar new cabinet. Among the other assets that petitioner acquired from Chappell's on July 1, 1967, was a 1963 Ford Falcon Econoline Van. The National Automobile Dealers Association Official Used Car Guide indicates that as of July 1, 1967, the average retail price for a 1963 Ford Falcon Econoline Van was $870. Petitioner assigned a basis for depreciation on this van of $2,700. Petitioner did not have the exclusive right to display its own brand of ice cream in the cabinets purchased from Chappell's. The retail establishments where these cabinets were located could place another brand of ice cream or any other kind of frozen food in petitioner's cabinet. In such case petitioner.s only recourse against the retail establishment would be to remove the cabinet. The retailer also had the right to order the cabinet removed at any time. Prior to the sale to petitioner Chappell's sold ice cream to about 300 locations which used its cabinets *60 and to about 115 other locations which had their own freezers. After the sale petitioner continued to sell ice cream to all of the customers previously served by Chappell's. Although Chappell's did continue in the dairy products business, it did not continue to sell ice cream in the Hazard, Ky., area after the sale of the business to petitioner. In particular, it did not sell ice cream to any of the customers served by petitioner. Prior to the sale of the ice cream business, Chappell's employed three men in connection with the ice cream distributorship. Immediately after the sale of July 1, 1967, these three men were employed by petitioner. Two of these three employees were truck drivers. Their duties were to call on the stores and businesses and put ice cream in the cabinets and make collections for these sales. These men worked on commission. These men were the only men in the business that had contact with the customers of the business. After the July 1, 1967, sale, Chappell's turned the commission book for these truck drivers or ice cream salesmen over to petitioner. Opinion Petitioner purchased an ice cream business from Chappell's on July 1, 1967, for $175,000. For purposes *61 of computing depreciation petitioner allocated nearly all of the purchase price, $172,030, to tangible assets purchased from Chappell's consisting in the main of 314 used freezer cabinets and trucks. Respondent determined that petitioners paid $126,355.81 to acquire goodwill or other intangibles having an indeterminate useful life and reduced the cost basis for depreciation of the tangible assets to $46,144.19. On brief respondent altered his approach somewhat and contended that petitioner paid between $87,500 and $126,355.81 for intangible assets. Although it is beyond dispute upon the record that the price that petitioner paid to Chappell's exceeded by a great deal the market value of the freezers and other equipment acquired, petitioner contends that it did not acquire any goodwill from Chappell's and that any disparity between the price for the tangible assets and their worth is due to the bad business judgment of petitioner.s president. Petitioner denies that there even could be any goodwill involved in the sale because it did not acquire Chappell's trade name or secure Chappell's covenant not to compete. For his part, petitioner's president testified that he arrived at a purchase *62 price for the business by merely inspecting the freezers to determine whether they were operating and by giving no 1016 consideration at all to goodwill. Petitioner's president was assisted in his inspection and evaluation by the plant manager of Beatrice Foods. Although petitioner's president and the Beatrice Foods manager were candid and credible witnesses, we cannot reconcile their testimony with other evidence in the record. Additionally, even if petitioner and Chappell's did give no consideration to the value of the intangible assets of the ice cream business, respondent is not necessarily precluded from determining that intangible assets did exist and from allocating a part of the purchase price to it. (C.A. 6, 1959). In this case petitioner could have purchased 314 brand new freezer cabinets for a price which was less than the portion of the $175,000 allocated to the used Chappell's cabinets; however, petitioner would not have been in the ice cream distributing business merely by purchasing the cabinets. It would have taken a great effort on petitioner's part to overcome the advantage that Chappell's enjoyed *63 by having its freezers already in place in about 300 retail establishments. Petitioner acquired that advantage when it purchased the business from Chappell's. Petitioner's acquisition of the freezers in place permitted it to step into Chappell's shoes easily. Similarly, petitioner's employment of Chappell's truck driver-salesmen gave it continuity with Chappell's 115 customers who owned their own freezers. By buying the freezers in place and employing Chappell's employees, petitioner obtained an advantage over competing ice cream distributors and received an expectation of being able to continue Chappell's profitable business. This competitive advantage and the expectation of profit clearly constituted an intangible asset. (C.A. 3, 1965), affirming a Memorandum Opinion of this Court. See . On the facts in this case we do not think that it was significant that petitioner did not acquire Chappell's trade name or covenant not to compete in purchasing the distributorship. The purpose of petitioner's purchase of the distributorship was to acquire *64 new outlets for its own brand of ice cream. Accordingl, it is unlikely that petitioner would have wanted Chappell's trade name or that it could have benefitted from using the name. Additionally, the testimony of petitioner's president does not specify the manner in which the freezers acquired from Chappell's were used. It is our impression that petitioner and Chappell's put only bulk ice cream in these freezers. If such was the case, the brand of ice cream sold was immaterial because the ultimate consumer would not receive his ice cream in a package identifying its source. Even if the source of the ice cream could be identified, we are certain that petitioner wanted the consumer to recognize its own brand name rather than Chappell's. These facts also indicate that the ice cream distributor's relationship with the retail establishment rather than with the ultimate consumer was the key to the success of the business. We have noted the advantages that petitioner obtained in dealing with these establishments by acquiring Chappell's in-place freezers and salesmen. The sale of the business divested Chappell's of these advantages. It would have been difficult for Chappell's to have competed *65 against petitioner, and it would have been against Chappell's interest to have tried to compete because such competition could have hurt petitioner's sales and would have delayed petitioner's payment of the purchase price. Chappell's covenant not to compete would have been superfluous. The final question to be settled is the value of the intangible assets that petitioner acquired. In his notice of deficiency and at trial respondent relied upon the residual or gap method to determine the value of the intangibles. Under this method the value of intangibles is the difference between the market value of tangible assets on the date of purchase and the purchase price. The gap method has been held to be an acceptable method of valuing intangibles. ; At trial respondent's expert witness valued the goodwill acquired by petitioner from Chappell's at $87,500. He arrived at this figure by valuing the tangible assets at about 60 percent of their original cost on the average. Although petitioner complains that used freezers in good operating condition were nearly as *66 valuable as new ones, petitioner's method of valuing assets was haphazard and unconvincing. On the record we can find no value for the intangibles that is more plausible than the estimate of respondent's witness. Accordingly, we hold that petitioner acquired intangible assets worth $87,500 in the July 1, 1967, purchase of Chappell's ice cream business. Decision will be entered under Rule 50. 1017 Footnotes
*. As revised by official Tax Court Order, dated 12/12/72 and signed by Judge Irwin. - CCH.↩